## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **STEVE HUDSON PARK,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00019 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ELECTRO-MECHANICAL** | ) | By:  James P. Jones |
| **CORPORATION,** | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, and N. Winston West, IV, STRELKA LAW OFFICE, PC, Roanoke, Virginia, for Plaintiff; Victor O. Cardwell, King F. Tower, Eric J. Sorenson, Jr., and Leah M. Stiegler, WOODS ROGERS PLC, Roanoke, Virginia, for Defendant.*

In this breach-of-contract case invoking the court's diversity jurisdiction, plaintiff Steve Hudson Park, a former executive of defendant Electro-Mechanical Corp. ("EMC"), claims that EMC owes him a severance payment pursuant to a Change in Control Severance Agreement.  Because I conclude that no change in control occurred, I will deny Park's Motion for Summary Judgment and grant EMC's Motion for Summary Judgment.

I.

The following undisputed facts are taken from the summary judgment record.

The plaintiff Park served as defendant EMC's Vice President of Marketing until his termination in July 2018.  EMC is a family-owned business engaged in the manufacture of electrical apparatus.  In 2015, EMC entered into Change in Control Severance Agreements with all executives at the vice president level and higher.  The stated purpose of these agreements was to provide some security to these executives as the Leonard family, which owned EMC, explored the possibility of selling the company.  The Change in Control Severance Agreement executed by Park and EMC includes the following provision:

    a.   Involuntary Termination Following a Change in Control.  If, on or within two years following a Change in Control, Company (or any parent or subsidiary of Company) terminates Executive's employment without Cause, or Executive resigns from such employment for Good Reason, then, in each case subject to Section 5, Executive will receive severance pay (less applicable withholding taxes) in the form of a lump sum payment equivalent to (i) two years of Executive's base salary (as such salary is in effect immediately prior to (A) the Change in Control, or (B) Executive's termination, whichever is greater), and (ii) Twenty Thousand Dollars.

Compl. Ex. A at 1-2, ECF No. 1-1.  The agreement defines "Change in Control" as:

    (i)     Any one person, or more than one person acting as a group, ("Person") becoming the beneficial owner, directly or indirectly, of securities of Company representing fifty percent or more of the total voting power represented by Company's then outstanding voting securities;

(ii)    The consummation of the sale or disposition by Company of all or substantially all of the Company's assets;

(iii)   The consummation of a merger or consolidation of Company with any other corporation, other than a merger or consolidation which would result in the voting securities of Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent of the total voting power represented by the voting securities of Company or such surviving entity or its parent outstanding immediately after such merger or consolidation; or

(iv)    A change in the composition of the Board occurring within a two year period, as a result of which less than a majority of the directors are Incumbent Directors. "Incumbent Directors" means directors who either (A) are directors of the Company as of the date of this Agreement, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the directors of the Company at the time of such election or nomination (but will not include an individual whose election or nomination is in connection with an actual or threatened proxy contest relating to the election of directors to the Company.)

For purposes of this definition of Change in Control, persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company. Notwithstanding the foregoing, and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (z) its sole purpose is to change the state of Company's incorporation, or (y) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

*Id.* at 4-5.  In claiming he is entitled to a severance payment, Park relies on definition (i).

On September 21, 2016, Francis Lee Leonard ("F. Leonard") died.  At the time of his death, F. Leonard, EMC's largest shareholder, owned 44.16% of EMC's stock.[1]  His will provided that upon his death, his shares of EMC would be transferred into a trust called the Marital Business Share.  On September 30, 2016, F. Leonard's widow, Jacqueline Leonard; their sons, Roger and Russell Leonard; and attorney C. Thomas Davenport qualified as executors of F. Leonard's estate. The named trustees of the Marital Business Share were Jacqueline, Roger, Russell, the President of EMC (who, at the time of F. Leonard's death, was Russell), and Davenport.  The will afforded Russell 1.5 votes upon any vote of the executors or trustees, while all other executors and trustees were granted only one vote.

Jacqueline was the income beneficiary of the Marital Business Share.  Upon her death, F. Leonard's will provided that the Marital Business Share would become part of another trust called the Family Trust.  F. Leonard's approximately 44.16% interest in EMC thus traveled from his hands into his estate, then into the hands of the co-trustees of the Marital Business Share to be held in trust for the benefit of Jacqueline and, ultimately, into the Family Trust.  F. Leonard's will provided that Jacqueline would receive the net income from the Family Trust

---

[1]  F. Leonard owned 204,426 out of 462,500 shares of EMC stock.

during her lifetime and that upon her death, the remainder would be distributed to the couple's four children, Roger, Russell, Renee, and Robin, either directly or through separate trusts.

At no time relevant to this case did F. Leonard own "securities of [EMC] representing fifty percent or more of the total voting power represented by [EMC]'s then outstanding voting securities."  Compl. Ex. A at 4, ECF No. 1-1. Therefore, the transfer of his shares could only serve to make the recipient a majority owner of EMC, for purposes of establishing a Change in Control, if the recipient was already the beneficial owner of approximately 6% or more of EMC stock.  At the time of F. Leonard's death, Jacqueline directly owned 24.22% of EMC's outstanding stock.[2]

Park contends that when F. Leonard died on September 21, 2016, Jacqueline became the beneficial owner of his 44.16% stake in EMC by virtue of being the income beneficiary of the Marital Business Share.  According to Park, Jacqueline's beneficial ownership interest in her late husband's shares, combined with her outright ownership of 24.22% of EMC's outstanding stock, gave her a majority ownership interest.  Importantly, Jacqueline sold her 24.22% of the shares to her children on December 31, 2016, before F. Leonard's shares had been distributed from his estate into the Marital Business Share.  Thus, by the time F. Leonard's

---

[2] Jaqueline owned 112,000 out of 462,500 shares of EMC stock.

shares were transferred to the co-trustees, Jaqueline did not own any other shares

of EMC.  Moreover, the transfer of F. Leonard's shares from the estate to the co-

trustees of the Marital Business Share occurred after Park's termination from

EMC.

On these facts, both parties have moved for summary judgment.  The

motions have been fully briefed and are ripe for decision.[3]

II.

The court is required to grant a motion for summary judgment "if the

movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling

on cross-motions for summary judgment, the court must, "[w]ith respect to each

side's motion, . . . view the facts and all justifiable inferences arising therefrom in

the light most favorable to the nonmoving party."  *Kolbe v. Hogan*, 849 F.3d 114,

130 (4th Cir. 2017) (internal quotation marks and citations omitted).  Summary

judgment is not a disfavored procedural shortcut, but an important mechanism for

weeding out claims and defenses that have no factual basis.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 327 (1986).  It is the affirmative obligation of the trial judge

---

[3] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court, and argument would not significantly aid the decisional process.

to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

The parties agree that Virginia law applies in this case.[4]  Generally, "[t]he interpretation of a contract presents a question of law."  *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (Va. 2006); *see also Fulton v. Henrico Lumber Co.*, 148 S.E. 576, 577 (Va. 1929) (noting the "general rule" that "documents must be construed by the court").  The intended expression of the parties' agreement is "derived from the plain language of [the] contract provision."  *Jimenez v. Corr*, 764 S.E.2d 115, 124 (Va. 2014).  Where contract language is ambiguous and evidence of the surrounding circumstances supports conflicting interpretations, the meaning of the contract "becomes a mixed question of law and fact" to be submitted to a jury.  *Fulton*, 148 S.E. at 577.  Whether a contract is ambiguous is also a question of law to be decided by the court.  *Langman v. Alumni Ass'n of Univ. of Va.*, 442 S.E.2d 669, 674 (Va. 1994) ("The question whether a writing is ambiguous is not one of fact but of law.")  Where a contract "is complete on its face, [and] is plain and unambiguous in its

---

[4]  In a diversity case, I must apply the conflict of laws rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  The Change in Control Severance Agreement states that it "shall be governed by the laws of the Commonwealth of Virginia without regard to its choice of [law] provisions."  Compl. Ex. A at 7, ECF No. 1-1.  Virginia generally honors contractual choice of law provisions. *Thornhill v. Donnkenny, Inc.*, 823 F.2d 782, 786 (4th Cir. 1987).  Moreover, the parties have relied on the application of Virginia law in their arguments.

terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Monticello Ins. Co. v. Baecher,* 477 S.E.2d 490, 491 (Va. 1996) (internal quotation marks and citation omitted).

"In determining whether a term is ambiguous, a court cannot look at the term in isolation; it must look at the term in the context of the entire contract." *James River Ins. Co. v. Doswell Truck Stop, LLC*, 827 S.E.2d 374, 376 (Va. 2019).

> The court must give effect to all of the language of a contract if its parts can be read together without conflict.  Where possible, meaning must be given to every clause.  The contract must be read as a single document.  Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties.

*Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983).

> The search for this plain meaning does not myopically focus on a word here or a phrase there.  Instead, it looks at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement.  The plain meaning of a word depends not merely on semantics and syntax but also on the holistic context of the word within the instrument.

*Erie Ins. Exch. v. EPC MD 15, LLC,* 822 S.E.2d 351, 355 (Va. 2019).  "If the plain meaning is undiscoverable, Virginia courts apply the contra proferentem canon, which construes ambiguities against the drafter of the ambiguous language." *Id.*

The instant dispute turns on the meaning of the phrase "beneficial owner," which is not defined in the Change in Control Severance Agreement.  Park contends that Jacqueline became the beneficial owner of F. Leonard's shares of

EMC stock when F. Leonard died because Jacqueline was the income beneficiary of the Marital Business Share, and the will provided that the shares would be held in that trust for her benefit.

EMC counters that an income beneficiary of a trust is not a beneficial owner because the income beneficiary does not have the power to vote or dispose of the shares. According to EMC, Jacqueline was never the beneficial owner of F. Leonard's shares of EMC. EMC posits that "beneficial owner" refers to either a person who directly owns stock or to a person or group that forms an LLC or other corporate entity to acquire stock. EMC further notes that by the time F. Leonard's shares made their way into the Marital Business Share, Jacqueline had already sold her shares of EMC to her children. Therefore, EMC argues, there was no point in time at which Jacqueline had any ownership interest in more than 50% of EMC's outstanding stock.

In his briefs, Park repeatedly states that Jacqueline did not become a beneficial owner of F. Leonard's shares by virtue of her role as a co-executor of his estate. Rather, Park focuses on Jacqueline's status as income beneficiary of the Marital Business Share. There are two key problems with Park's legal theory.

First, F. Leonard's shares were not transferred from the estate into the Marital Business Share until several months after Park was terminated. That

transfer, then, cannot have constituted a Change in Control that would entitle Park to recover anything under the Change in Control Severance Agreement.

Park attempts to get around this fact by asserting that an estate is merely a legal mechanism and an estate cannot own anything.   Based on this logic, Jacqueline became a beneficial owner of the shares upon F. Leonard's death because under his will, she would be the income beneficiary of the trust that would eventually, at some future time, hold the shares.   But the will provided that the residue of the estate would not be distributed to the Marital Business Share and its counterpart, the Marital Real Estate Share, until after the estate's debts and costs had been paid.   There was thus no guarantee of exactly how many shares would be distributed to the Marital Business Trust or when that distribution might occur.   In other words, at the time of F. Leonard's death, Jacqueline's interest in the shares was at best anticipated and contingent rather than actual.   I reject Park's argument that Jacqueline became a beneficial owner of F. Leonard's shares upon her husband's death or at any other point prior to the transfer of the shares into the Marital Business Share.

The second fatal flaw in Park's theory of the case is that Jacqueline, as income beneficiary of the Marital Business Share, did not have the power to vote the shares held by the trust, or the power to direct how they would be voted.   She was simply entitled to receive income from the corpus of the trust during her

lifetime.  Park himself suggests that "beneficial owner" as used in the Change in Control Severance Agreement has the definition set forth in the Virginia Stock Corporations Act, with respect to appraisal rights and other remedies:  "'Beneficial owner' means any person who, directly or indirectly, through any contract, arrangement, or understanding, other than a revocable proxy, *has or shares the power to vote, or to direct the voting of, shares*; . . . ."  Va. Code Ann. § 13.1-729 (emphasis added).  Jacqueline, as income beneficiary of the Marital Business Share, did not meet Park's own proffered definition of "beneficial owner" of the shares held in that trust.  Jacqueline did have the power as co-executor to vote F. Leonard's shares in his estate, acting as a group with the other co-executors, but Park expressly waived any argument that Jacqueline was a beneficial owner by virtue of her role as co-executor.

Park argues that the following provision of F. Leonard's will gave Jacqueline the power to direct the voting of the shares in the Marital Business Share: "Notwithstanding any other provision in this Will to the contrary, my wife shall have the right to compel my Trustees to convert any non-income producing assets of the Marital Trust into income-producing assets."  Pl.'s Br. Supp. Pl.'s Mot. Summ. J. Ex. A at 3, Last Will & Testament of Francis Lee Leonard § 5(A), ECF No. 29-4.  It did no such thing.  That provision only allowed Jacqueline to direct the Marital Business Share to sell the EMC stock if it ceased producing

income.  The referenced clause did not give Jacqueline the right to force the co-trustees to vote the shares according to her wishes.  In any event, the problem remains that F. Leonard's shares were not held in the Marital Business Share until after Park was terminated.

EMC raises additional arguments in support of its Motion for Summary Judgment and in opposition to Park's Motion for Summary Judgment.  I need not address those other arguments because the issues above are dispositive.  I conclude that based on the undisputed facts, no change in control occurred in the two years prior to Park's termination, and EMC is therefore entitled to judgment as a matter of law.

III.

For the foregoing reasons, it is **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 28, is DENIED, and Defendant's Cross Motion for Summary Judgment, ECF No. 30, is GRANTED.  Judgment will be entered herewith.

ENTER:   December 2, 2020

/s/  JAMES P. JONES
United States District Judge